IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ROBIN CALICO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CV 08-RRA-2184-S |
| ) | |
| LIFE INSURANCE COMPANY OF NORTH ) | |
| AMERICA; ADVANTAGE 2000 ) | |
| CONSULTANTS, INC.; LEHIGH CEMENT ) | |
| COMPANY; and LEHIGH CEMENT ) | |
| COMPANYMEDICAL DENTAL EXPENSE ) | |
| AND LONG-TERM DISABILITY BENEFITS ) | |
| FOR SALARIED EMPLOYEES EMPLOYEE ) | |
| WELFARE BENEFIT PLAN, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OF OPINION

This is an ERISA[1] case filed by the plaintiff, Robin Calico, against the defendants, Life Insurance Company of North America ("LINA"), Lehigh Cement Company Medical Dental Expense and Long-Term Disability Benefits for Salaried Employees Employee Welfare Benefit Plan ("Lehigh Plan") and Lehigh Hanson ("Lehigh"), formerly known as Lehigh Cement Company (collectively "defendants"). The complaint presents a claim under 29 U.S.C. § 1132(a)(1)(B) for allegedly wrongfully denying benefits.[2]

---

[1] The Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001, *et seq.*)

[2] The complaint actually contains three counts. The first is for wrongfully denying benefits under ERISA. The second is labeled "Estoppel;" however, count two makes the same claim for benefits, and argues that the defendants are estopped from denying them. The court has previously rejected the estoppel argument. (Doc. 52.) Count three alleges breach of fiduciary duty. That claim was dismissed by this court on October 22, 2009. (Doc. 56.) This action is simply a claim for benefits.

1

The case comes before the court on the defendants' motions for summary judgment. (Docs. 60, 61.)

STANDARD AND SCOPE OF REVIEW

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-957, 103 L. Ed. 2d 80 (1989). Here, it is undisputed that the policy vests LINA with the discretionary authority to find facts and determine eligibility for benefits. Because LINA both insures benefits and administers claims under the Plan, LINA is to be presumed to operate under a conflict of interests.

Until recently, the Eleventh Circuit used the following six-step process for judicial review of virtually all ERISA benefit denials:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review her decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams v. Bellsouth*, 373 F.3d 1132, 1138 (11th Cir. 2004). In light of the United States Supreme Court decision in *Metropolitan Life Insurance Company v. Glenn*, ___ U.S. ____, 128 S. Ct. 2343 (2008), the Eleventh Circuit recently overhauled the last steps of this process for analysis of cases such at the instant case, in which a presumed conflict of interests exists. *Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352 (11th Cir. 2008). *Doyle* held that "*Glenn* implicitly overrules and conflicts with our precedent requiring courts to review under the heightened standard a conflicted administrator's benefits decision." 542 F.3d at 1359; *see Glenn*, 128 S. Ct. 2343, 2351 ("Neither do we believe it necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict.").

> D*oyle* states, post-*Glenn* that
>
> the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious. And we hold that, while the reviewing court must take into account an administrative conflict when determining whether an administrator's decision was arbitrary and capricious, the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest.

542 F.3d at 1360.

*Glenn* and *Doyle* altered the last steps of the *Williams* analysis in that if a court determines that an administrator's benefits-denial decision was wrong, but nevertheless

reasonable, the court may consider the administrator's conflict of interests as a factor in considering whether the decision was arbitrary and capricious. Under the arbitrary and capricious standard, a as long as a benefits decision was not "completely unreasonable," even if wrong, it will not be reversed. *Brown v. Blue Cross and Blue Shield of Ala.*, 898 F.2d 1556, 1564 (11th Cir. 1990). "[T]his court's 'judicial role is limited to determining whether the . . . interpretation was made rationally and in good faith-not whether it was right.'" *Griffis v. Delta Family-Care Disability*, 723 F.2d 822, 825 (11th Cir. 1984) (quoting *Riley v. MEBA Pension Trust*, 570 F.2d 406, 410 (2d Cir.1977)). "'When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard (sometimes used interchangeably with an abuse of discretion standard), the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made.'" *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) cert. denied, 129 S. Ct. 646, 172 L. Ed. 2d 614 (U.S. 2008) (quoting *Jett v. Blue Cross & Blue Shield of Ala.*, 890 F.2d 1137, 1139 (11th Cir.1989)).

In summary, the burden is always on the plaintiff, however, to show the existence of a conflict on the part of the decision-maker and the impact of that conflict on the decision itself. If the decision was not unreasonable, it will be upheld, even if based on an incorrect analysis.

## UNCONTESTED STATEMENT OF FACTS[3]

      A.      The Group Long-Term Disability ("LTD") Policy

1.      LINA issued Group LTD policy, FLK-030077 (the "Policy"), to Lehigh to insure the LTD component of the employee welfare benefit plan established and maintained by Lehigh, Plaintiff's former employer.

2.      Under the Policy, it is the claimant's responsibility to provide on-going proof of disability or benefits will terminate. Furthermore, LINA is vested with full discretionary authority to determine eligibility for benefits thereunder as evidenced by the following language:

> For plans subject to the Employee Retirement Income Security Act (ERISA), the Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has appointed the Insurance Company as the Plan Fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of the Plan to the full extent permitted by the law. ...

(Policy, Amendment No. 3 (LINA/Calico 745)) (emphasis added).

3.      "Disability" or "Disabled" for purposes of Plaintiff's eligibility for disability benefits is defined in the Policy as follows:

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is either:
>
> 1.      unable to perform all the material duties of his or her Regular Occupation or a Qualified Alternative; or
>
> 2.      unable to earn 80% or more of his or her Indexed Covered Earnings.

---

[3] These following facts have been offered by the defendants and have not been disputed by the plaintiff. Pursuant to the court's scheduling order, these facts are deemed to be admitted, and have been copied verbatim. All facts listed herein have been supported by portions of the administrative record. Except where portions of the administrative record have been quoted, the court has omitted the citations.

> After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is either:
>
> 1.      unable to perform all the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; or
>
> 2.      unable to earn 80% or more of his or her Indexed Covered Earnings.
>
> The Insurance Company will require proof of earnings and continued Disability.

(Policy at p. 4)

B.      Plaintiff's Claim and Award of LTD Benefits

4.      Plaintiff Robin Calico was employed by Lehigh as an Office Manager when she ceased work in May 2004 due to degenerative disc disease and fibromyalgia, among other conditions.

5.      LINA received Plaintiff's application for group disability benefits, which stated that her condition was "fibromyalgia, degenerative disc disease, surgery lumbar micro discectomy, surgery cervical spine, osteoarthritis, loss of bone density (mass), SI joint injections, IBS and GERD."

6.      Plaintiff underwent back surgery on June 3, 2004.

7.      On July 7, 2004, Dr. Carter Morris, the surgeon who performed Plaintiff's back surgery, indicated that at four weeks post-op, Plaintiff had some soreness in her right hip with some muscular back pain. Dr. Morris recommended physical therapy.

8.      On August 4, 2004, Dr. Morris indicated that Plaintiff was able to return to full duty work from a surgical stand point. Dr. Morris released Plaintiff to Dr. Louis Heck, rheumatologist, for pain management on August 11, 2004.

9.      Plaintiff completed a disability questionnaire on November 1, 2004. She indicated that she has constant pain in her muscles and joints, used a walking stick when she walked for exercise, and drove as little as possible. She also indicated that she was able to take care of her personal needs, and engage in water therapy. She listed her medications as Nexium, Zelnorm, Miralax, HS Estratest, Lexapro, Voltaren, Xanax, Lortab, and Zanaflex.

10.     On November 9, 2004, in response to a request from LINA regarding Plaintiff's current level of functionality, Dr. Heck indicated that due to fibromyalgia, a herniated disc and low back pain, Plaintiff could not work.

6

11.     On January 6, 2005, LINA informed Plaintiff that it was approving her claim for LTD benefits and that the benefits were awarded retroactively to November 11, 2004.

12.     Plaintiff underwent a SI joint stabilization "with cannulated threaded cancellous screws, two on each side" on January 11, 2005.  (AR at 1422).

13.     On April 12, 2005, Plaintiff underwent a multilevel myelogram.  The lumbar myelogram disclosed "disc bulges in the lumbar spine" as well as "screws bilaterally through the sacroiliac joints" and the cervical myelogram revealed "slight decreased filling of the left C5 nerve."  (AR at 971).  The doctors summarized that "[t]he vertebral body and disc heights appear normal."  (Id.)

14.     Plaintiff also underwent a CT scan of her lumbar spine and cervical spine on April 12, 2005.  The CT scan of her lumbar spine revealed "no definitive cause for [Plaintiff's] right lower extremity pain."  (AR at 974-75).  Likewise, the CT of Plaintiff's cervical spine demonstrated "no definitive signs of disc disease" and "no dominant cause for [Plaintiff's] right arm pain."  (AR at 972-73).

15.     On June 7, 2005, Plaintiff underwent a MRI of her brain with normal results.

16.     Plaintiff underwent a MRI of her cervical spine on June 7, 2005.  The test demonstrated a solid interbody fusion at C5-6 and revealed advanced degenerative disc disease at C-7 which was "stable in comparison to a previous study."  (Id.)

17.     Plaintiff also underwent a MRI of her thoracic spine on June 7, 2005, which revealed mild degenerative disc disease and "facet arthritic changes at the L2-3 and L5-S1 levels."  (AR at 1401).

18.     Plaintiff received lumbar epidural steroid injections from Dr. Daniel Michael, orthopedic surgeon, at various times in 2005.  Dr. Michael had also successfully treated Plaintiff's symptoms with trigger point injections.

19.     Plaintiff completed another disability questionnaire on August 2, 2005 in which she stated that she could take care of her own personal needs, could drive up to 15 miles, and engaged in a regular exercise program including water therapy 2-3 times a week and/or yoga.  Plaintiff also indicated that she had obtained her GED and had worked as an administrative assistant/office manager throughout her career.  She listed her medications as Aciphex, Lexapro, Xanax, Oxycontin, Zanaflex, Amitiza, Miralax, and Estradiol.  Plaintiff added that she was not able to return to work due to her pain level per Dr. Heck and that she was not interested in exploring her career options for that same reason.

20.     On September 15, 2005, Plaintiff underwent a MRI of her hips.  The results of this test showed no remarkable abnormalities.  In a follow up office visit on September 19, 2005 with Dr. Michael, Plaintiff was given an intra-articular injection

in the right hip.  Dr. Michael indicated Plaintiff had "dramatic improvement in some of the symptoms she was having with the pain" after the injection.  (AR at 1356).

21.     Plaintiff was awarded Social Security Disability benefits on November 18, 2005, with a retroactive disability date of November 1, 2004.  The Administrative Law Judge based his opinion on records from providers including Baptist Medical Center – Shelby, Brookwood Medical Center, Dr. Morris, Dr. Dickerson, Dr. Michael, and Dr. Heck.

. . .

22.     By letter dated May 9, 2006, LINA informed Plaintiff that her claim was approaching the time when the definition of disability would change, and she would be required to be disabled from performing any occupation.  LINA further informed Plaintiff that it had begun a review to determine if she would remain eligible for benefits beyond November 11, 2006, when the contract's definition of disability changed.

23.     LINA undertook efforts to contact Plaintiff's treating physicians and collect medical records, clinical findings and Physical Ability Assessments ("PAA").

24.     On May 15, 2006, an EMG and Nerve Conduction Study were performed on Plaintiff's right arm and both of her legs.  The study disclosed "extremely mild carpel tunnel syndrome on the right."  (AR at 490).  The study further showed that "[t]here was no evidence of a peripheral neuropath in the nerves tested in either leg."  (AR at 490-91).  The radiologist interpreting the study concluded that "[t]here was no evidence of a C5 through C8 radiculopathy on the right nor evidence of an L4 through S1 radiculopathy bilaterally."  (AR at 491).

25.     On September 19, 2006, Dr. Heck completed a PAA and, based on Plaintiff's subjective complaints, provided restrictions and limitations including: occasionally sit, stand, walk, reach, and occasionally push, pull, or carry 10 pounds. Dr. Heck opined that Plaintiff was unable to perform sedentary or light work. (AR at 439-441).

26.     A LINA nurse case manager contacted Dr. Heck to clarify Plaintiff's functional limitations.  Dr. Heck indicated Plaintiff was unable to sit for long periods of time and was unable to type, but he did not indicate any objective findings to support this opinion.  Since Plaintiff's purported inability to work was based on subjective complaints of pain, Dr. Heck suggested a Functional Capacity Evaluation ("FCE").

27.     Dr. McCool, an Associate Medical Director for LINA, reviewed Plaintiff's medical records and clinical findings.  He opined that even although Plaintiff was taking Oxycontin, the X-rays, MRIs and nerve conduction studies were all "within normal limits" for herniations and radiculopathy.  He further opined that the medical records did not support Dr. Heck's restrictions and limitations.

28.     Plaintiff was referred to HealthSouth for a FCE, which was performed on November 16, 2006.  The results of the FCE indicated Plaintiff was capable of performing light-duty work on an 8 hour per day basis. (AR at 369-97).  During the assessment, Plaintiff demonstrated positional tolerances for occasional carrying, pushing, pulling, sitting, standing, walking, stair climbing, stooping, crouching and floor level reaching.  (AR at 369).  The occupational therapist who performed the examination added that Plaintiff demonstrated "self limiting behavior . . . during the lifting portion of testing which may indicate that greater lifting abilities may be possible."  (AR at 369).

29.     A Transferable Skills Analysis was then performed by a LINA vocational rehabilitation counselor.  The analysis considered Plaintiff's education and prior work history of office manager and administrative assistant, and noted Plaintiff possessed skills transferable to clerical supervisory positions that could be performed within her stated limitations.  For purposes of this analysis, the restrictions and limitations from Plaintiff's FCE were utilized, however, a sedentary level of physical demand was used as a maximum physical threshold.  The vocational rehabilitation counselor identified two occupations within the Birmingham, Alabama labor market which met Plaintiff's wage requirement as provided in the Policy and for which Plaintiff possessed the appropriate skills, education and work history: (1) order department supervisor; and (2) accounting clerk supervisor.  These positions allowed for sitting and standing as tolerated.

30.     LINA informed Plaintiff by letter dated January 4, 2007 that her LTD benefits had been terminated as she no longer met the definition of total disability.  The letter detailed LINA's investigation of Plaintiff's claim and acknowledged that while Plaintiff may experience "low back, neck, generalized pain . . . the medical on file [did] not reflect a condition which [] would preclude [Plaintiff] from working any occupation."  (AR at 178).

C.      The Appeal Process

31.     On January 18, 2007, Plaintiff wrote LINA to appeal its decision.  In her letter, Plaintiff informed LINA that she had recently had knee surgery and Dr. Michael had referred her to Dr. Byrd, a hip specialist in Nashville, Tennessee.  Plaintiff's letter also described chronic pain, difficulties experienced during her FCE, and attached a list of thirteen medications.  (AR at 275, 278).

32.     Plaintiff's counsel wrote LINA on June 11, 2007 to supplement Plaintiff's January 18, 2007 letter, but did not attach any additional medical or clinical information.

33.     LINA also received letters from Dr. Laurence Bradley, Professor of Psychology and Medicine, dated February 1, 2007, and Dr. Heck dated June 26, 2007, both of which opined Plaintiff could not return to the work force.  Neither Dr. Bradley nor Dr. Heck provided clinical evidence to support Plaintiff being totally disabled and unable to work in a sedentary functional capacity.

9

34.     In connection with its consideration of Plaintiff's appeal, LINA requested that another in-house medical director review Plaintiff's claim. Associate Medical Director Dr. Seiferth reviewed all of Plaintiff's available medical records, test results and studies, including the FCE. On October 1, 2007, Dr. Seiferth concluded that the "medical does not provide evidence of a loss of function of sedentary capacity to support restrictions." (AR at 1100).

35.     By letter dated October 8, 2007, Plaintiff was informed that LINA was upholding its benefits termination decision on appeal. The letter addressed the material submitted in support of Plaintiff's appeal and recited Dr. Seiferth's review concluding that "it has been determined that the medical evidence fails to support [Plaintiff's] inability to perform any occupation . . . ." (AR at 867).

36.     The letter further informed Plaintiff that, at this time, she could request an additional review of the denial decision, but that she also had the right to bring legal action.

. . .

37.     Six months later, in April 2008, Plaintiff's retained counsel, Jeffrey Cotney, wrote to LINA to request another review of the denial decision and demanded that Plaintiff's benefits be reinstated.

38.     By letter dated May 6, 2008, Plaintiff's counsel provided additional information in support of Plaintiff's appeal.

39.     Specifically Plaintiff's counsel submitted medical records from Drs. Heck, Pearlman, Black, Dickinson, Morris, Michael, Bramlett, Rudeseal, and Kirksey. These records spanned the time period from May 29, 2003 to May 2008. The records received from counsel largely consisted of the records previously submitted and considered by LINA.

40.     Plaintiff's counsel also submitted LINA's internal guidelines regarding Transferable Skills Analyses and submitted a transcript of a segment broadcast on ABC's Good Morning America.

41.     New records from Dr. Michael's office reflect Plaintiff underwent a MRI of her knee on September 13, 2006. The test revealed degenerative findings but no meniscal tear or other internal derangement was evident.

42.     On December 23, 2006, Plaintiff underwent outpatient surgery on her left knee. Plaintiff had her first post-op visit with Dr. Michael on January 3, 2007. At this time, Plaintiff had minimal fluid and was continuing to work on rehabilitation exercises.

43.     Plaintiff underwent a MRI of her lumbar spine on October 31, 2006. The results of this study revealed degenerative postoperative changes of the lumbar spine.

The radiologist concluded there was "no dominant cause for patient's bilateral hip pain . . . [b]ack pain certainly could be caused by changes at the L2-3 level." (AR at 1011).

44.     Plaintiff also underwent a MRI of the sacroiliac joints which revealed "no significant MR abnormality of the sacroiliac joints after fusion."  (AR at 1013).

45.     On April 11, 2007, Plaintiff also underwent a bone density study which reflected osteoporosis and demonstrated increased risk of fracture.

46.     On April 17, 2007, Plaintiff underwent a lumbar facet injection.

47.     Plaintiff underwent a MRI of her lumbar spine on January 8, 2008, which revealed advanced degenerative disc changes with a mild diffuse disc bulge without significant stenosis.  The test also revealed central disc protrusion and slight disc bulges without significant stenosis.

48.     With her second appeal, Plaintiff also submitted records from Dr. Kirksey at The WorkPlace at UAB dated April 2, 2008.  Plaintiff self-referred to Dr. Kirksey seeking surgery on her back.  After examination, Dr. Kirksey noted that she did not feel Plaintiff was a surgical candidate, but stated that she "would most likely benefit from chronic pain management."  (AR at 1025-29.)

49.     By letter dated May 29, 2008, Plaintiff's counsel submitted additional information to LINA.  The documents included: a response to the HealthSouth FCE by Bledsoe Occupational Therapy dated February 19, 2008; a FCE conducted on March 20, 2008 by Bledsoe Occupational Therapy; and a vocational assessment dated April 3, 2008.

50.     On May 28, 2008, LINA referred Plaintiff's claim file to MES Solutions for a peer review.  The review was conducted by Dr. Frank Polanco, a board certified physician in occupational medicine with additional expertise in pain management.  Dr. Polanco certified that there was no conflict of interest.

51.     Dr. Polanco spoke with Dr. Heck on June 5, 2008.  Dr. Heck provided Dr. Polanco with updated information regarding Plaintiff's functional status, and Dr. Polanco noted that this information had an impact on his opinion.

52.     Dr. Polanco attempted to contact Dr. Pearlman on June 2, 3, and 4, 2008.  On June 3, 2008, Dr. Pearlman's office told Dr. Polanco that Plaintiff had not been seen in their office in several years and they could provide no further information.

53.     Dr. Polanco also attempted to contact Dr. Michael, but the contact number provided was disconnected and there was no new listing.

54.     Dr. Polanco noted in his report that "[b]ased on an objective review of the records and conversations with claimant's provider, there is no medical evidence to preclude the claimant from a return to work full-time sedentary level."  (AR at 801).

11

Dr. Polanco considered Dr. Heck's opinion that Plaintiff's condition was deteriorating and she could not perform sedentary activity, but found that the "medical record supports a physical capacity of at least a sedentary level based on the FCE of 2/19/08 [the FCE obtained by Plaintiff's counsel]." (Id.) (emphasis added).

55. For the second time, LINA upheld its denial decision by letter dated June 18, 2008. In this letter it communicated that "the medical information does not support a functional loss which would preclude [Plaintiff] from performing any sedentary occupation. As a result the medical information on file does not support disability as defined in the policy; therefore, we must affirm our previous decisions to deny benefits under this plan effective December 11, 2006." (AR at 797).

56. By letter dated June 24, 2008, Plaintiff's counsel requested from LINA certain documents and information involved in assessing Plaintiff's claim.

57. Plaintiff filed this lawsuit on November 19, 2008.

(Doc. 63, pp. 2-16.)


ANALYSIS

A plaintiff seeking benefits under the terms of an ERISA governed plan bears the burden of establishing that he or she is entitled to such benefits. 29 U.S.C. § 1132(a)(1)(B); *Horton v. Reliance Std. Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998); *Gipson v. Admin. Cmte. of Delta Air Lines, Inc., et al.*, 2009 U.S. App. LEXIS 23662 (11th Cir. Oct. 27, 2009). In the instant case, the first twenty-four months of benefits are payable to the plaintiff if she cannot perform her <u>own</u> occupation.[4] After the first twenty-four month of benefits, however, the terms of the plan require the plaintiff to prove that she is "totally disabled" from performing <u>any</u> occupation.

Because the plaintiff has not responded to the motion for summary judgment, it is difficult to discern what she contends prevents her from performing any occupation. Her

---

[4] Those benefits were paid, and are not at issue in this case.

initial application for group disability benefits stated that her condition was "fibromyalgia, degenerative disc disease, surgery lumbar micro discectomy, surgery cervical spine, osteoarthritis, loss of bone density (mass), SI joint injections, IBS and GERD." In her complaint, the plaintiff discusses only her back, stating:

> 27. Plaintiff has a long history of severe and increasing pain in her back and multiple treatment procedures and surgery.
>
> 28. Plaintiff suffers from disabling diseases, including but not limited to degenerative disc disease.
>
> 29. In 1990 Plaintiff underwent a C4-5 cervical fusion.
>
> 30. In 2004 Plaintiff underwent a lumbar micro-diskectomy at L2-3.
>
> 31. Plaintiff thereafter underwent a period of multiple SI joint injections.

(Doc. 1, pp. 5-6.)

The evidence shows that the plaintiff underwent back surgery in June 2004 (AR at 671), a stabilization procedure in January 2005 (AR at 1422), and knee surgery in December 2006 (AR at 1002-07). The plaintiff was released to work after her back surgery, and referred to a pain management doctor. (AR at 652-53).

Beginning in April 2005, the plaintiff had the following tests performed which were essentially normal:

- CT scans (AR at 972-75)
- Myelogram (AR at 971)
- MRI of the brain (AR at 592)
- EMGs (AR at 490-91)
- Nerve Conduction Studies (AR at 490-91).

The plaintiff also had several MRIs of the spine (AR at 591, 1011, 1013, 1023, 1401), which demonstrated the presence of disc bulges and degenerative disc disease. The most recent MRI of the plaintiff's lumbar spine, January 2008, reflected degenerative changes, but no significant stenosis. (AR at 1023).

From the last of the plaintiff's back surgeries in 2004, until her claim was denied in January 2007, the plaintiff underwent no additional surgery for back pain and participated in no extensive physical therapy. She obtained a surgical consult with UAB in April of 2008, at which time the doctor stated, "I do not feel that she is a surgical candidate," and suggested that she most likely would benefit from continued pain management. (AR at 1028). Accordingly, the plaintiff's last back surgery was two and a half years before benefits terminated. (AR at 671, 1002-07).

Further, there is no evidence that the plaintiff suffers from any disabling or other negative effects from pain medicines. In fact, the plaintiff admitted in a disability questionnaire that she could take care of her personal needs, drive up to fifteen miles, and engage in regular exercise. (AR at 1246-49). Dr. Polanco did not state that her functional capacity would be altered or diminished from her continued prescription drug use. Instead, he recommended that she seek ongoing medication management, stating that her "[p]hysical findings reflect that neurologically she is intact and remains functional." (AR at 801-02). While he concluded that her "surgical procedures appear to have complicated her condition to a degree," Dr. Polanco "would not preclude function at a sedentary level." (AR at 802).

Even though Dr. Heck's records indicate that the plaintiff is stable on pain medications, he consistently stated that she could not work in any capacity. (AR at 52,

693-94, 439-41, 801, 850). The basis for Dr. Heck's opinion is the plaintiff's subjective complaints of pain. When LINA investigated this complaint of pain by contacting Dr. Heck, Heck suggested that the plaintiff undergo a functional capacity evaluation ("FCE"). (AR at 52, 439-41). The new FCE demonstrated light functional capacity. (AR at 369-97). "Light" functional capacity is a greater capacity than "sedentary," which is what the defendant stated the plaintiff could do. The plaintiff challenged this FCE and her lawyer obtained a second FCE on her behalf. Dr. Polanco relied on this second FCE, the one secured by the plaintiff's attorney, in support of his opinion that the plaintiff was able to function in a sedentary level. (AR at 801).

At least four phsyicians dispute Dr. Heck's findings. Dr. McCool, an Associate Medical Director for LINA, reviewed the collected medical records and test findings as of October 2006, and determined that all of the test results were "within normal limits" and that the restrictions and limitations were not supported by the medical evidence. LINA obtained a second in-house medical opinion from another Associate Medical Director, Dr. Seiferth, who concluded that the medical evidence "does not provide evidence of a loss of function of sedentary capacity to support restrictions." As noted above, LINA also engaged an independent medical record review from Dr. Polanco who spoke directly with Dr. Heck and took into consideration Dr. Heck's assessment of the plaintiff. Still, Dr. Polanco determined that the records supported the plaintiff's ability to perform sedentary work. In addition to all of these medical consultants, LINA also reviewed the consult from a UAB physician, Dr. Kirksey, who recommended only that the plaintiff seek ongoing pain management.

Upon careful review of the policy provisions in this case, and in light of the record in this case, the plaintiff has not carried her burden of showing that the denial decision here was "wrong." Summary judgment should be granted on that basis alone. Alternatively, even if the decision were wrong, there was, based on the evidence, a reasonable basis for the decision.[5]

## CONCLUSION

Based on the foregoing, the motions for summary judgment are due to be granted and this case dismissed. An order in accordance with this memorandum of opinion will be entered.

DONE this 8th day of September, 2010.

_____
Robert R. Armstrong, Jr.
United States Magistrate Judge

---

[5] For the same reasons it rejected the estoppel argument in document 25, the court rejects it here.